UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,          Case Number 17-20627
v.                                       Honorable David M. Lawson

BRANDON DAMAR LUCAS,

          Defendant.
_____/

## ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

Defendant Brandon Lucas has filed a motion asking the Court to resentence him to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239, or alternatively, to recommend to the Bureau of Prisons (BOP) that he be transferred to home confinement under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2).  The government does not dispute Lucas's argument that his physical health, coupled with his conditions of confinement at FCI Hazelton where an inmate has tested positive for COVID-19, amount to extraordinary and compelling reasons for a sentence reduction under section 3582(c)(1)(A)(i).  However, it argues that contends that Lucas has not exhausted his remedies with the BOP, a necessary prerequisite for seeking compassionate release.  The record supports the conclusion that Lucas has satisfied the statute's exhaustion requirement.  Nonetheless, Lucas has not shown that the factors in 18 U.S.C. § 3553(a) that the Court must consider favor immediate release.  The Court also does not believe that a recommendation for early placement by the BOP to home confinement is appropriate.   The motion will be denied.

I.

Lucas robbed two 7-Eleven stores at gunpoint in Redford Township, Michigan, one on September 5, 2017, and the other on September 6. Police arrested Lucas on September 6 after finding a gun in his car and a lot of cash in his pocket. On September 21, 2017, a federal grand jury charged him with two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), two counts of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and one count of possessing a stolen firearm, in violation of 18 U.S.C § 922(j).

On November 22, 2017, Lucas pleaded guilty to two counts of Hobbs Act robbery and one count of brandishing a firearm during and in relation to a crime of violence. The Court sentenced him on May 10, 2018, to 96 months' imprisonment, which included a mandatory consecutive 84-month sentence on the brandishing charge. Lucas did not appeal, and the Court later denied a motion for collateral relief. His projected release date is July 27, 2024.

On April 24, 2020, Lucas sought compassionate release from the Bureau of Prisons (BOP) due to the health risks posed by the coronavirus pandemic. He sent the following email to "FCI Health Services":

> I recently received a message in my emails talking about the release of inmates that have underline [sic] health conditions such as diabetes and high blood pressure and I was told to send a cop out to you about it from a staff member. I was wondering if you could see if I qualify for that compationate [sic] release. Thank you!

Compassionate Release Email, ECF No 72-1, PageID.651. After not hearing back, Lucas filed a motion for compassionate release with the Court on June 10, 2020. After the Court appointed counsel on June 22, his attorney sent the BOP a follow-up letter asking that he be considered for home confinement as well as compassionate release on June 25, 2020.

Lucas is a 25-year-old African-American male. He described these offenses as the worst decision of his life, coming after a 15-year battle with depression and drug abuse. During childhood, his life was unstable and he was subject to physical abuse. He suffered from significant mental health issues that qualified him for Social Security disability benefits at nine years old. He also suffers from learning disabilities, with an IQ score in the low-average range of intellectual functioning. When he committed the crimes for which he is incarcerated, his criminal history included one conviction for attempted carrying a concealed weapon, for which he successfully completed probation under Michigan's Holmes Youthful Training Act.

Lucas alleges that he suffers from type-2 diabetes, high cholesterol, obesity, and hypertension. His medical records confirm his diabetes and obesity but indicate that his cholesterol is normal with medication. The records also indicate labile blood pressure: in June 2020 he registered a slightly elevated reading of 123/82, and tests conducted between January and March 2020 indicated that he was hypertensive. He is on medication for his diabetes and takes Lisinopril (for hypertension) and Atorvastatin (for cholesterol) daily.

Lucas presently is confined at FCI Hazelton in Bruceton Mills, West Virginia. That facility houses 1,735 inmates, none of whom have active cases of COVID-19. However, four staff members have active cases, and one inmate tested positive but has since recovered. *COVID-19*, Bureau of Prisons (July 30, 2020), https://www.bop.gov/coronavirus/.

Lucas enrolled in GED courses at FCI Hazelton, which he has not yet completed, and has maintained clear institutional conduct for over two years. His only discipline occurred in early July 2018, when he stuck his hand through the food slot in his cell to get a guard's attention because his cellmate was sick. He says that he has "devoted himself to faith, attending Bible study."

If released, Lucas plans to live with his mother in Redford, Michigan. She has confirmed that Lucas can live with her. She is a manager at a local clothing store and can employ Lucas.

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release." *Ibid.* "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). However, prisoners may not seek judicial relief before they have sought release under this statute from the prison warden. "Even though [the] exhaustion requirement does not implicate [the Court's] subject-matter jurisdiction, it remains a mandatory condition," and "[i]f the Director of the Bureau of Prisons does not move for compassionate release, a prisoner may take his claim to court only by moving for it on his own behalf. To do that, he must fully exhaust all administrative rights to appeal with the prison or wait 30 days after his first request to the prison." *Id.* at 833-34 (quotations omitted).

A.

The government contends that Lucas did not exhaust his administrative remedies, asserting that he never contacted BOP authorities to request relief because of his health conditions. It dismisses out-of-hand Lucas's email to Health Services, believing that it did not set forth any grounds for relief. That is incorrect. Lucas's email referenced his health conditions and inquired whether he qualified for release. Courts have not imposed strict-compliance requirements on compassionate release requests; to the contrary, as *pro se* communications, they are viewed liberally. *See, e.g., United States v. Head*, No. 2:08-CR-00093-KJM-2, 2020 WL 3180149, at *3-4 (E.D. Cal. June 15, 2020) (rejecting argument that strict compliance with 28 C.F.R. § 571.61(a) is necessary).

Moreover, as Lucas's attorney points out, the government recently conceded in two other cases in this district that similar emails started the 30-day waiting period. *See United States v. Cotton,* No. 16-20222, ECF No. 437, PageID.3757 (conceding that defendant's email inquiring about compassionate release to "Inmate Work Assignment: Bates orderly" started the 30-day clock, but maintaining that the time had yet run out) (E.D. Mich. June 11, 2020); *United States v. Goins,* No. 11-20376, ECF No. 34, PageID.180 (conceding that defendant's email inquiring about compassionate release to "Inmate Work Assignment: food service," which was subsequently denied, satisfied the exhaustion requirement) (E.D. Mich. May 21, 2020).

Lucas made his request and then waited 30 days before filing his motion in court. That is all he was required to do to satisfy the exhaustion requirement under section 3582(c)(1)(A). *Alam*, 960 F.3d at 834 (holding that "prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them").

B.

Under that statute, the Court can order a reduction of a sentence, even to time served, *first*, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *second*, if "extraordinary and compelling reasons warrant such a reduction," and *third*, the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it").

The government offers several reasons for denying release. It insists that compliance with the Sentencing Commission's policy statement is mandatory, and points to one line in section 1B1.13 that requires the prisoner to prove lack of dangerousness. But that requirement is a condition of 3582(c)(1)(A)(ii). Lucas has invoked 3582(c)(1)(A)(i), which contains no such requirement.

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3551(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need … to protect the public from further crimes of the defendant"). And any sentence reduction also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

The sentence in this case was driven largely by the mandatory minimum prison term required for individuals brandishing a firearm during a crime of violence. 18 U.S.C. § 924(c)(1)(A)(ii). However, the Court determined at the time that the sentence was necessary to achieve the goals of sentencing Congress identified in 18 U.S.C. § 3553(a). One of the goals — protection of the public — was paramount in this case. Lucas suffered from depression, which he acknowledges propelled him into these robberies as acts of desperation. And in doing so, he used a stolen handgun to intimidate and endanger convenience store clerks. Lucas's personal history furnishes good reasons for his desperation, his anger, and his need for substantial personal support. Even now, Lucas is a 25-year-old, relatively uneducated man with little to no work experience. He does not have a GED (although he is currently taking courses for one), has no financial savings, has not completed his release preparation program, and has little to no work experience. He therefore presents a risk of returning to crime. His mother is willing to house and employ him, which may lessen that risk. But until Lucas achieves some measure of stability on his own, the public remains at risk.

Lucas has served about 35 months of his 96-month sentence. He has not offered a convincing argument for why he would not return to his former illegal methods if his sentence were reduced. Consideration of the factors in 18 U.S.C. § 3553(a) does not favor a sentence reduction.

To establish extraordinary and compelling reasons for the relief he requests, Lucas points to the conditions of his physical health, arguing that he is vulnerable to complications if he were to contract COVID-19. And he is understandably concerned about being infected with the coronavirus. "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as

cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications and death. Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020). "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." *United States of America v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020).

Moreover, "the crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of high-risk inmates serving federal sentences." *Ortiz*, 2020 WL 3640582, at *2 (collecting cases; footnotes omitted).

And it is widely recognized and publicly acknowledged that persons who are diabetic face increased risk of severe consequences from potential COVID-19 infection. *United States v. Lassister*, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.") (citing *Coronavirus Disease 2019 (COVID-19)*, People Who Are At Risk for Severe Illness, Centers for Disease Control & Prevention (June 25, 2020), https://bit.ly/2WBcB16). The combination of diabetes and hypertension may further increase the risk of severe complications from potential infection.

*Compare Malam v. Adducci*, --- F. Supp. 3d---, No. 20-10829, 2020 WL 2468481, at *7 (May 12, 2020) (ordering supplemental briefing) *with Perez-Perez v. Adducci*, --- F. Supp. 3d ---, No. 20-10833, 2020 WL 2305276, at *3 (E.D. Mich. May 9, 2020) (granting petition for habeas corpus because defendant had hypertension and was housed in a facility with a confirmed case of COVID-19).

However, although his diabetes places him at higher risk of complications, Lucas's medical records show that his condition is well controlled. The same appears true for his hypertension and high cholesterol. The government concedes that the defendant's condition "qualifies as an 'extraordinary and compelling reason' for compassionate release to be considered under USSG § 1B1.13(1)(A)." However, it argues that Lucas "has exhibited an unwillingness to comply with medical direction concerning his diabetes, including eating and testing requirements, which suggests that if he were released, his diabetes would be left uncontrolled." Response, ECF No. 70, PageID.492.

Moreover, according to BOP statistics, there are no active cases among inmates at "Hazelton FCI." *COVID-19*, Bureau of Prisons (July 7, 2020), https://www.bop.gov/coronavirus/ (under "full breakdown and additional details"). Although Lucas's medical conditions may place him at a higher risk of complications if he were to contract COVID-19, they do not make him more vulnerable to catching the disease initially.

None of this is to minimize the seriousness of the coronavirus pandemic or the alarming rapidity of its spread within federal prisons. But the pandemic is a global phenomenon and some risk is inherent no matter where Lucas resides, either at home or in prison. He asserts that his risk would be lower at home, but he has not put forth any convincing evidence to demonstrate that he is at an especially elevated risk of harm in the present situation of confinement. And Michigan

has a significant number of confirmed COVID-19 cases. Although the government has acknowledged that the novel coronavirus can support a finding of "extraordinary and compelling reasons" for medically vulnerable individuals, when the factors in section 3553(a) are "considered," Lucas has not shown justification to reduce his sentence to time served.

III.

Lucas also requests that the Court recommend that the BOP place him in home confinement under the CARES Act, 18 U.S.C. § 12003(b)(2). A defendant's request for home confinement under the CARES Act is different than a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020); *United States of America, v. Benjamin Gordon*, No. CR416-082, 2020 WL 3964041, at *1 (S.D. Ga. July 13, 2020). Section 12001(b)(2) is directed at the Attorney General. If he finds that emergency conditions will materially affect the functioning of the BOP, the Director of the BOP may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2). Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281 (2020). And the Attorney General has done just that: in a memorandum issued on April 3, 2020, the Attorney General utilized his authority under the CARES Act to direct the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where COVID-19 is materially affecting operations." *See* Memorandum from the Attorney General to the Director of the Bureau of Prisons (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

But under section 12001(b)(2), "[d]esignation of an inmate's place of confinement, including placement in home confinement, rests within the absolute discretion of the BOP." *United States v. McCloskey*, No. 18-CR-260, 2020 WL 3078332, at *2 (S.D. Ga. June 9, 2020); *see also United States v. Calderon*, No. 1911445, 2020 WL 883084, at *1 (11th Cir. Feb. 24, 2020) (explaining that under 34 U.S.C. § 60541(g)(1)(A), the Attorney General "may" release eligible elderly offenders, and the district court was without jurisdiction to grant relief). Therefore, the district court has no authority to grant relief under section 12003(b)(2).

However, the defendant's request might be invoking a similar provision of the Second Chance Act. "The Second Chance Act of 2007 . . . increases a federal prisoner's eligibility for pre-release placement in a halfway house from 6 to 12 months, and requires the Bureau of Prisons (BOP) to make an individual determination that ensures that the placement is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" *Vasquez v. Strada*, 684 F.3d 431, 432-33 (3d Cir. 2012) (quoting 18 U.S.C. § 3624(c)(6)(C)). "In accordance with the Act, regulations were issued so that placement in a community correctional facility by the BOP is conducted in a manner consistent with 18 U.S.C. § 3621(b)." *Ibid.* (citing 28 C.F.R. § 570.22). That statute, in turn, states that any recommendation by the sentencing court that a convicted person serve a term of imprisonment in a community corrections facility "shall have no binding effect on the authority of the Bureau . . . to determine or change the place of imprisonment of that person." 18 U.S.C. § 3621(b). Relevant factors that the BOP shall consider include "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence; and (5) any pertinent policy statement issued by the Sentencing

Commission." *Lovett v. Hogsten*, No. 09-5605, 2009 WL 5851205, at *1 (6th Cir. Dec. 29, 2009) (citing 18 U.S.C. § 3621(b)).

Lucas's prison record appears to be clear. But the Court believes that the BOP is in a better position than the Court to assess the propriety of the defendant's placement for reentry at an appropriate time, based on the applicable statutory factors and all of the information then available.

IV.

Lucas has exhausted his administrative remedies, but he has not demonstrated that compassionate release under 18 U.S.C. 3582(c)(1)(A)(i) is justified.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 63) is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   July 31, 2020